IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARIA SMITH, on behalf of herself and all others similarly situated,**<br>      **Plaintiff,**<br><br>        **v.**<br><br>**JOHN HANCOCK LIFE INSURANCE COMPANY,**<br>        **Defendant.** | **CIVIL ACTION NO. 06-3876** |

## MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

### I.      BACKGROUND

This case involves a deferred annuity which includes a "bonus rate" of interest payable to the purchaser of the annuity in year one.  Deferred annuities are not licensed security products, but rather, are only regulated by state insurance departments. Frequently, deferred annuities are sold through distribution channels such as commercial banks.

When an individual purchases a deferred annuity they typically make an initial lump sum investment which may be followed by subsequent investments in the product. The monies invested are then managed by the insurance company and a rate of return is applied on a periodic basis to the current value of the annuity.  There are very limited circumstances under which the purchaser can take money out of the product in early years or before it annuitizes.  Some of those circumstances involve major medical emergencies, limited withdrawals of less than 10% of the value of the annuity and other limited circumstances.  At some point in the life of a deferred annuity, the purchaser will "annuitize" the product and receive periodic payments from the insurance company. During the first 5 to 15 years, a deferred annuity has surrender charges which are

penalties assessed against the purchaser for withdrawing monies prior to the annuitization phase.

Insurance companies, such as John Hancock Life Insurance Company ("JH"), use an undisclosed yield "spread" which is actuarially priced into their deferred annuities, such as the GPA Choice product present in this case.  This spread is the difference between the rate earned on investments by the insurance company and the interest rate that is actually credited back to the purchaser's annuity account.  This spread is never disclosed orally or in writing by the insurance company.  The spread itself is made up of multiple factors, most of which account for any expense the company incurs in designing, selling, marketing and servicing the annuity products, including profit.  In the present case, the spread also accounts for the first year credited bonus rate.   This is never disclosed.  JH recoups the amount of the bonus which was credited in year one by increasing the undisclosed spread beginning in year two and thereafter in increments (basis points) until the total bonus amount is recouped in full.

The Plaintiff has conducted extensive class certification discovery with numerous depositions and examined thousands of pages of actuarial and marketing documents.  For the Court's convenience, the identity of the individuals whose depositions are most often cited in this brief are as follows:

1.     Ian Roke – JH Asst. Vice President for Fixed Products – *See* Ex. A.

2.     Kristen Temple – JH Director of Fixed Products and Pricing – *See* Ex. B.

3.     John Fenton – JH actuarial expert – *See* Ex. C.

4.     William C. Cutlip – Plaintiff's actuarial expert – *See* Ex. D, Deposition vol. I; Ex. E, Deposition vol. II; Exhibit F, Affidavit.

As the Court will see below, these claims brought by the Plaintiff are due to be certified as a class action.

## II.    FACTS

### A.    The Class Representative

In May 2002, Maria Smith purchased a JH deferred annuity through JH's agent Keystone Savings Bank and its employee Tim Lago.  Complaint ¶ 5; Ex. G, Answer to Plaintiff's First Interrogatories n. 3; Ex. H, Plaintiff's Response to Defendant's First Set of Interrogatories no. 8.  Plaintiff's annuity was initially funded with $50,000.  Class Complaint ¶ 5; Ex. I.  Smith purchased a GPA Choice Annuity with a one year rate guarantee period.  Ex. J.  The yield on her initial premium payment was to be 5.5%, representing base rate plus a 1% bonus for the first year.  The GPA Choice was sold with either a one year or five year guarantee period, with the choice being left to the purchaser. Id.  Nowhere in the documents executed by Smith was there an informative disclosure particular to the bonus feature of the annuity.  Ex. B, Temple dep., vol. I, p. 34.

### B.    The bonus is supposed to be an extra feature of a fixed annuity.

JH does not draw any distinction between a bonus annuity and a non-bonus annuity. Ex. C, Fenton dep. p. 37.  The bonus is simply an additional feature of the fixed annuity.  Id.  "With a regular annuity, a purchaser invests a premium (or series of premiums) with an insurance company.  The company, in turn, invests those premiums and returns a portion of that investment to the purchaser so that the invested premium can grow."  Ex. F, aff..of William C. Cutlip ¶ 6.  Insurance companies pay their expenses, capture charges and make their profit from their invested "spread".  Id; Ex. C, Fenton dep. at 45.  Spread is "the difference between the insurance company's investment

earnings on the fund and the portion of those earnings credited to the purchaser." Id; Ex. C. Fenton dep. at 52. Bonus annuities, such as those at issue here, are the same as regular annuities, except they give the appearance of being initially enhanced. Id at ¶ 7. An annuity with a first year bonus feature provides the purchaser with "something in addition to the base rate." Ex C, Fenton dep. at 64.

### C.    The bonus annuity does not really provide a "bonus" (something extra) to the purchaser.

Although JH guaranteed Smith's 1% bonus, they never intended to take it out of the spread; rather, JH intended to get a spread that was going to cover the bonus starting in year two going forward. Ex. E Cutlip dep., vol. II at 109. Companies know that a higher interest rate ("bonus rate") in the first year will reduce their first year spread or profit. Ex. F Cutlip aff. ¶ 10. Therefore the company, through actuarial pricing, increases the spread for future years by lowering the interest rate credited to the purchaser in order to recoup their first year lost profit. Id.

### D.    The same contract formation and actuarial process is in place for all class members.

In designing deferred annuities, insurance companies use a base model or "chasis." There were minor variations between products, but the "chasis" for all GPA Choice contracts were the same. Ex. A, Roke dep. at 157. The same contract was used for all the GPA Choice products. Id at 162– 163. The GPA Choice product, that Maria Smith purchased, was sold from 2001 through 2003. Id. at 15-16; Ex. G at no. 4. While annuitants were credited different renewal rates, **the process of crediting the renewal rates was identical**. Id at 157 – 159; Ex. C Fenton dep. at 51(emphasis added). JH established the target spread at the inception of the policy. Ex. C Fenton dep. at 52.

Plaintiff had a 1% bonus rate on her GPA Choice annuity.  The GPA Choice product was issued with different bonus rate percentages at different times, but other than the amount the rest of the product was the same.  Ex. A Roke dep. at 33 – 34.

The process and procedure for crediting bonus rates is the same regardless of the amount of the bonus feature.  Ex. C Fenton dep. at 116 ("the crediting rate process, in terms of how it manifests itself, would be the same").  There is no difference in how JH credits different bonus amounts.  Id at 118.  A certain amount of basis points are factored into the spread over the life of the contract to recoup the first year bonus.  Ex. A Roke dep. at 64.  The mechanics of factoring the bonus into the spread worked the same starting in year two of the contract going forward.  Id at 65.

E.     **The contract guaranteed the bonus for a certain period of time.**

The bonus annuity guaranteed to credit the bonus rate during first year of the contract.  Ex. K, Individual Annuity Application; Ex I, GPA Choice Annuity.  The bonus rate was guaranteed in the contract.  Ex. E Cutlip dep., vol. II at 138.  The bonus rate is applied for either one or five years depending upon the guarantee period.  Ex. A Roke dep. at 76.  JH guarantees the bonus will be credited in year one and that once credited it is for the permanent benefit of the annuitant as long as the contract is kept in-force for the full first year.  Id at 77-78.

F.     **Recoupment of the first year bonus was not revealed to the class members.**

The recoupment of the first year bonus through the spread is not disclosed to purchasers.  Ex A Roke dep. at 151 – 152.  JH uses a "spread" to recover expenses and account for a profit.  Id at 50 - 53.  How the spread is priced or calculated and what

components go into the spread are not disclosed to purchasers.  Id at 63 - 64, *see* Ex F,

Cutlip aff.  ¶ 6.

     JH's goal was an ultimate spread and they set their renewal rates to achieve that

spread.  Ex. E Cutlip dep. vol. II p.144.    This emphasis on the spread negated any bonus

guarantee.  All things being equal a non-bonus annuity would have a higher credited rate

to the annuitant than a bonus annuity.  Ex. A, Roke dep. p. 80.  The spread is higher on

bonus annuities, because the company recoup's the bonus amount, so when the spread is

higher the credited rate is lower.  Id.

     The insurance departments of New York and Pennsylvania require a Disclosure

Statement regarding the bonus feature.  JH only used bonus disclosure language in New

York, New Jersey and Pennsylvania.  Ex. B Temple dep. at 28-30; *see* Ex. Q Pennsylania

Disclosure, Ex. R. New York/ New Jersey Disclosure.   Pennsylvania bonus disclosure

states:

> "The expenses for a contract with a bonus benefit may be higher than
> expenses for a contract without a bonus benefit.  The amount of the bonus
> benefit may be more than offset by the fees and charges associated with
> the bonus benefit,"

The New York and New Jersey bonus disclosure states:

> "The five-year guarantee period option contains a 1.50% first-year interest
> rate bonus.  Fixed Annuities that do not offer bonuses may have lower
> surrender charges and/or shorter surrender charge durations, credit higher
> interest rates in the succeeding years of the guarantee period, or offer
> higher renewal rates than fixed annuities that do not offer bonuses.  You
> should compare this product with other fixed annuities to see if it meets
> your needs.  For New York certificate holders, "bonus" is referred to as
> additional interest rate credit in the certificate."

Despite the fact that JH was required to have the bonus disclosure in its Pennsylvania Disclosure Statements, Plaintiff's Disclosure Statement contained no such bonus disclosure language. Ex. B Temple dep. at 37.

> **G.      John Hancock used actuarial processes to recoup the "bonus" amount over the life of the contract.**

The bonus paid the first year of the contract is recouped through the expense element of the spread over the life of the contract. Ex. A Roke dep. at 64 – 65. The bonus is accounted for in the spread as if it were any other expense. Id at 63 – 65. The bonus amount is an undisclosed expense built into the spread. Id at 59 - 60. JH had a pattern of recouping the first year bonus through the renewal rates to meet the target spread. Ex E. Cutlip dep., vol. II p. 129. JH's target spread and profit drove the credited renewal rates, which essentially left the guaranteed bonus ignored. Id pp. 112 – 114.

## III.     ARGUMENT

> **A.      Any doubts concerning whether a class should be certified should be resolved in favor of certification.**

To maintain a class under Fed. R. Civ. P. 23, plaintiffs must satisfy the prerequisites of Rule 23(a), and one of the requirements of Rule 23(b). *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 177-178 (194). There is "nothing in either the language or the history of Rule 23 that gives the Court any authority to conduct a preliminary inquiry into the merits of the suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure, contravenes the rule." *Id*. The inquiry herein is not whether the Plaintiffs will ultimately prevail on the merits of the claim. [1] "In order to be

---

[1] Discovery in this case, is ongoing and certainly will reveal other facts pertinent to the issue as raised herein. At this point, no merits discovery has taken place pursuant to this Court's Order. However, this is no impediment to Class Certification. The *Manual for Complex Litigation* expressly notes, "the determination of whether the prerequisite of Rule 23 (a) and (b) are satisfied can generally be made on the

certified, a class must satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation" and in this case must also satisfy the requirements of Rule 23(b)(3) that "common questions of law fact predominate and that the class action mechanism is the superior method for adjudicating the case." *In Re Prudential Insurance of American Sales Practice Litigation*, 148 F. 3d. 283, 308-309 (3d Cir. 1998). Alternatively, Plaintiff seeks certification under Rule 23(b)(2) which is satisfied by showing that the Defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P 23(b)(2).

These requirements do not mandate that "all putative class members share identical claims, and that the factual differences among the claims of the putative class members do not defeat certification." *Baby Neal v. Casey*, 43 F.3d, 48, 46 (3d Cir. 1994) (Citations omitted). "In deciding certification, the courts must take a liberal rather than a restrictive approach in determining whether the Plaintiffs satisfy these requirements and may exercise broad discretion in weighing the propriety of a putative class." *Steinberg v. Nationwide Mutual Insurance Company*, 224 F.R.D. 67, 72 (E.D. N.Y. 2004) (citations omitted).

Consistent with this liberal approach, the court in assessing class certification must assume the allegations in the Complaint are true. *Id.* (citations omitted). Further, the court's assessment of class certification must not evolve into a "preliminary inquiry

---

pleadings and declarations, with relatively little need for discovery." *Manual for Complex Litigation,* 3d, Section 30:02 at 215 (1995). The reason for this rather low threshold, is that a Court may revisit its decision on class certification as the discovery process evolves. *See,* Fed. R. Civ. P. 23 (C)(1); *General Telephone Co. v. Falcon,* 457 U.S. Fed. 147, 160 (1982)("even after a certification order in a class action is entered, the Judge remains free to modify it in light of subsequent developments in the litigation.")

into the merits." *Eisen*, 417 U.S. at 177.  "Whether the Plaintiff's have stated a cause of action or will prevail on the merits is not a consideration for resolution of a motion for class certification." *Steinberg*, 224 F.R.D at 72 (citation omitted).  "[I]f there is to be an error made, let it be made in favor and not against the maintenance of the class action." *Espelin v. Hirshi*, 402 F.2d 94, 99 (10th Cir. 1968), c*ert. denied*, 394 U.S. 928 (1969). *See also Eisenberg v. Gagnan*, 766 F.2d 770 (3d. Cir. 1985): *Green v. Wolf Corp.* 406 F.2d 291 (2d Cir. 1968), c*ert. denied*, 395 U.S. 977 (1969); *C.V. Reit, Inc. v. Levy*, 114 F.R.D. 690 (S.D. Fla. 1991): *Joseph v. General Motors, Corp.*, 109 F.R.D. 635 (D. Colo. 1986).

**B.      Rule 23(a) requirements are met.**

**1.      Numerosity exists.**

"The Court must find that the class is 'so numerous that joinder of all members is impracticable.'" *In re Prudential*, 148 F.3d at 309, citing Fed. R. Civ. P. 23(a).  "'Impracticable' in this context is not to be confused with impossible.  Rule 23(a)(1) only requires that, in the absence of a class action, joinder would be 'difficult' or 'inconvenient.'" *Steinberg*, 224 F.R.D. at 72 (citation omitted).

The Third Circuit has certified classes with as few as 90 members.  *See Eisenberg*, 766 F.2d at 785-786.  It is generally held within this circuit that numerosity is met if the proposed class exceeds 100 members.  *Welch v. Board of Directors of Wildwood Golf Club*, 146 F.R.D. 131, 135 (W.D. Pa. 1993).  *See also In re Phar-Mor, Inc. Securities Litigation*, 875, F. Supp. 277, 279 (W.D Pa. 1994).  Since 2001, JH has sold thousands of GPA Choice annuities nationwide for total sales of over four million

9

dollars.  Ex. A Roke dep. at 37; Ex. L.   The impracticability of joining this vast number

of annuity holders is readily apparent.  Clearly numerosity has been established.

Even if the class in this case were not so plainly laid out, the law is that neither

exact class size nor identification is necessary for class certification.   *Newberg* states the

following with regard to class size and identification:

> Though some courts have said a class action determination may not be
> based on mere speculation, the prevailing view is that the plaintiff need
> not allege the exact number or identity of the class members.   A contrary
> rule would foreclose most class litigation because of the impossibility of
> identifying all class members at the outset and would make large class
> suits unduly burdensome because of the grave expense involved in
> identifying members.  While the plaintiff has the burden of showing that
> joinder is impractical, a good faith estimate should be sufficient when the
> number of class members is not readily ascertainable.

*Newberg on Class Actions*, § 3.05, pp. 3-18, 19, 20.

### 2.     Sufficient common questions of law and fact exist.

"The commonality requirement [of Fed. R. Civ. P. 23(a)(2)] will be satisfied if the

named Plaintiffs share at least one question of fact or law with the grievances of the

perspective class." *Baby Neal*, 43 F.3d at 56.  *See also In re Prudential*, 148 F.3d at 310.

Because this requirement may be satisfied by the presence of a single common issue, it is

"easily met." *Prudential*, 148 F.3d at 310.   "A common question is one which arises

from a "common nucleus of operative facts" regardless of whether "the underlying facts

fluctuate over the class and vary as to individual claimants." *In re Asbestos School

Litigation*, 104 F.R.D. 422, (E.D Pa. 1994), *aff'd in relevant part rev'd in part sub nom*,

789 F. 2d 996 (3rd Cir.), *cert. denied*, 479 U.S. 852 (1986)(citations omitted).

This prerequisite is easily satisfied here, where there are multiple common issues

of law and fact that arise from materially identical standard form bonus annuity contracts

and a systemic, uniform practice of actuarial pricing by JH.   Indeed, "[w]hether defendants participated in a [common] course of conduct is a common question." *Hanrahan v. Britt*, 174 F.R.D. 356, 363 (E.D Pa. 1997) (citing cases).   It is indisputable that Plaintiff's and class members' claims arise from a common nucleus of operative facts.   Plaintiff's claims involve common factual allegations regarding JH's conduct, including, but not limited to: (a) the Plaintiff and class members signing of contracts with JH for annuities with a first year bonus feature; (b) those contracts did not contain disclosure language regarding the bonus annuity feature; (c) at no time did anyone affiliated with JH inform Plaintiff that the bonus could and would be recouped; and (d) JH set its target spread and/or renewal credited rate so that JH would recoup the first year bonus.  Plaintiff's expert William Cutlip testified:

> "—the commonality of the entire class is predicated on the first year bonus that was not a first year bonus because it was expected that it was going to be recouped.
> Now the interest rates will very from time to time, but that does not change the issue nor does it change the fact that  -- that damages can be determined that would be equitable amongst the whole class."

Ex A, Cutlip dep., vol. I, p. 84.

In addition to the above list of common questions, Plaintiff's claims involve common legal allegations regarding JH's conduct towards Plaintiff and class members. These relevant issues include: (a) did JH misrepresent to the Plaintiff and class members that they would receive the full benefit of a permanent bonus paid in year one when JH actually designed the product to recoup the entire bonus from the inception of the contract; (b) did JH breach the annuity contracts between Plaintiff and the class members; (c) did JH intentionally or negligently fail to disclose to Plaintiff and the class members

that JH would recoup the bonus; (d) did JH's conduct violate the Pennsylvania Unfair Trade Practices Act.

Commonality is not a high bar to obtain.  Here Plaintiff and class members entered into materially identical form annuity contracts.  Plaintiff alleges the same course of conduct and the same concealment efforts by JH throughout the class.  JH's actions are not isolated or discrete instances, but rather, they amount to a pattern of common misconduct.  Because it is only necessary that a single common issue exist, Plaintiff has easily satisfied this requirement.  *See Meyer v. CUNA Mutual Group*, 2006 WL 197122, **16-17 (W.D. Pa. Jan. 25, 2006)(certifying breach of contract class involving interpretation of form disability insurance contracts); *Steinberg*, 324 F.R.D 67, 79 (certifying breach of contract claim involving materially similar automobile insurance contracts and Nationwide's common practice of taking "betterment" deductions on claims under those insurance contracts).

### 3.    Plaintiff's claims are typical of class members' claims.

Rule 23(a) requires that the claims of the representative parties be "typical" of those of the class.  This does not require the claims to be identical, in fact homogeneity between representative plaintiffs and all class members is not required.  *Baby Neal*, 43 F.3d at 57; *In Re Chambers Dev. Co. Sec. Litig.*, 312 F. Supp. 822, 834 (W.D. Pa. 1995) ("'typical' does not mean identical"); *Phar-Mor*, 875 F. Supp. At 279 (interest of plaintiff and proposed class need not be identical).  "Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58.   A representative's claim qualifies as typical if it "arises from the same … practice or course of conduct" as those

of the class generally, and the claims are based "on the same legal theory." *Id.* (quoting *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3rd Cir. 1992)); *Safaran v. United Steal Workers of Am.*, 13 F.R.D. 397, 402 (W.D. Pa. 1989). "The threshold for establishing typicality is low." *Seidman v. American Mobile Systems, Inc.* 157 F.R.D. 354, 360 (E.D. Pa. 1994). *See also Newton v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-184 and Fn. 28 (3rd Cir. 2001) (citing cases).

In this case, the legal theory shared by the Plaintiff and the class as a whole is identical.  As Plaintiff complains and the evidence presented herewith confirms, Plaintiff and all class members rely on standard form annuity contracts that have materially identical provisions and on precisely the same pattern of standardized conduct in designing and developing those annuities and treatment of the bonus features in those annuities.  Any alleged factual differences do not affect the central allegations against JH. Plaintiff, on behalf of the class, has sued one corporate defendant responsible for a single course of conduct.   As such, "their claims on the same legal theor[y] of ...breach of contract...[is] typical of the class as a whole" *Bradberry v. John Hancock Mut. Life Ins. Co.* 217 F.R.D. 408, 413 (W.D. Tenn. 2003).  Accordingly, Plaintiff has satisfied Rule 23(a)(3)'s typicality requirement.

### 4.      Plaintiff will fairly and adequately represent the class.

Rule 23(a)(4) requires that the named plaintiff fairly and adequately protect the interest of the members of the class.  "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the Plaintiff must not have interest antagonistic of those of the class." *Hoxworth*, 980 F.2d at 923 (citations omitted); *see also Wetzell v. Liberty*

*Mutual Insurance Company*, 508 F.2d 239 (3rd Cir. 1975); *In re Asbestos School Litigation*, 104 F.R.D. at 430.

There are no personal or employment relationships between the Plaintiff and the Defendant and no indication of conflicting interest appears in the record. Courts do not require the representing Plaintiff to be the "best of all possible Plaintiffs or to be especially knowledgeable, intelligent, or possessing a detailed understanding of the legal or factual basis on which a class can be maintained." *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966).

In recognition of the fact that class representatives will not always grasp the intricacies of a complex action, the adequacy prong is properly focused on the capabilities of Plaintiff's counsel to vigorously prosecute the class claims. The other prong of the test of whether there is adequate representation - assurance that the action will be vigorously prosecuted - is also present in this action. "[T]he single most important factor considered by the court in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney." *1 Newberg on Class Actions* 3d. (1992) § 3.24 at 3-133 n.353. "In reaching a determination concerning vigorous prosecution of the actions on behalf of the class, courts consider the competence and experience of class counsel, attributes which will most often be presumed in the absence of proof to the contrary." *Id,* at 3-134.

Here, there is no real question that Plaintiff's counsel is adequately qualified to pursue this case. They have handled numerous class actions and have pursued this action vigorously, taking numerous depositions, filing motions to compel, and expending a good

deal of time and resources in pursuit of this action.   See Ex M, Biographies of the proposed class counsel.

###### C.      Plaintiff satisfies both Rule 23(b)(2) and (b)(3) requirements.

In addition to satisfying the Rule 23(a) prerequisites, Plaintiff must also demonstrate that she can satisfy at least one of the three subdivisions under Rule 23(b). Here, Plaintiff asserts that this action can be maintained as a class under either Rule 23(b)(2) or 23(b)(3).

###### 1.      Rule 23(b)(2)

Under Rule 23(b)(2), a class action is maintainable if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, by making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  A class should be certified under Rule 23(b)(2) "where a declaratory or injunctive relief is an important aspect of the overall relief sought."  *In Re NASDAQ Mkt-Makers Antitrust Litig.*, 169 F.R.D. 493, 516 (S.D.N.Y 1996).  Plaintiff can satisfy this requirement.

"What is important is that the relief sought by the named plaintiffs should benefit the entire class."  *Baby Neal*, 43 F. 3d at 59.  As alleged in the Complaint, JH has engaged in a systematic, series of wrongful conduct that has proved to be quite profitable to JH.   The question in this case becomes whether the action, with an eye toward the relief requested, is the type of class that qualifies to be evaluated under (b)(2) standards. According to the *Manual for Complex Litigation*, a class is typically certified under Rule 23(b)(2) when "class wide injunctive or declaratory relief is necessary to redress group

injuries... and is commonly relied on by litigants seeking institutional reform through injunctive relief." *Manual for Complex Litigation*, § 21.141 (4th ed. 2004).

As stated above, Plaintiff and each class member have been deprived of their guaranteed first year bonus interest rate.  All class members seek a declaration that JH's practice of recouping the bonus through the spread breaches the contract.  Plaintiff seeks to require JH to disclose to purchasers that the bonus is recouped and will likely result in lower credited renewal rates than a non-bonus annuity over the life of the contract.

The allegations in the complaint are based entirely upon the premise that JH acted on grounds generally applicable to the class.   Further, the requested injunctive relief is an important and necessary component of the relief sought by the class as a whole, especially for those class members whose annuities are still in-force.    Accordingly, it proper to certify the class under Rule 23(b)(2).

## 2. Rule 23(b)(3)

Finally, this class is also certifiable pursuant to Rule 23(b)(3).  The particular requirements to Rule 23(b)(3), are that common issues of law and fact predominate over individual issues within the class and that a class action is a superior method to other available methods for the fair and efficient adjudication of the controversy.   "Rule 23(b)(3) is intended to be a less stringent requirement than Rule 23(b)(1) or (2)." *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 41(1st Cir. 2003)(citation omitted). "To satisfy the predominance requirement, there needs to be a common nucleus of operative facts." *Bradberry*, 217 F.R.D. at 414.  "Predominance is usually decided on the question of liability, 'and if the liability is common to the class, common questions are held to predominate over individual ones.'" *Fry v. UAL, Corp.* 136 F.R.D. 626, 637

(N.D. Ill. 1991)(citing *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981)).   "[W]here the defendant's liability can be determined on a class wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited of vehicle to resolve such a controversy." *Sterling v. Velsicol Chemical Corp*, 855 F.2d 1188, 1196-97(6th Cir. 1988).

Here, the Plaintiff can establish that there are multiple common issues of law and fact predominating over any potential individual issues.   It is clear that a single resolution of the common issues will significantly advance the outcome of the potential class members' claims.   Moreover, a class action is the superior method of adjudication to resolve this action.

### a.   Common questions of law and fact predominate on liability

In *Amchem Products, Inc. v. Weinsher*, 521 U.S. 591, 594 (1997), the Supreme Court noted that Rule 23(b)(3) predominance inquiry tests whether a proposed class is "sufficiently cohesive to warrant adjudication by representation."   The Supreme Court then noted that the predominance requirement is easily met in cases alleging consumer fraud. *Id.*, 521 U.S. at 625.   "[I]n general, predominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *Allapattah Services, Inc., v. Exxon Corp.*, 33 F.3d 1248, 1261, quoting *In re Vitamins Antitrust Litigation*, 209 F.R.D. 251, 262 (D.D.C. 2002).

Here common questions of law and fact will be the overwhelming focus of the litigation and will predominate over any hypothetical issues.   As discussed more fully above, Plaintiff and all class members purchased a deferred annuity with a bonus feature.

Plaintiff and all class members allege JH never intended the first year bonus to be permanently credited to the purchaser's account.   In fact, JH set a target spread to be achieved over the life of the annuity and checked that spread on a weekly or nearly weekly basis.   Ex. N, Weekly Annuity Rate Analysis(for example).   Maintaining this targeted spread and profit drives what interest rate is credited to the annuity holder. Maintaining the "bonus" interest rate is not considered by JH, only maintaining the targeted spread and their profit.   JH has operated their annuities this way over time, but did not disclose this procedure to Plaintiff or the class members.   All of these core issues are identical between Plaintiff and class members.

**b.      Individual damages issues do not predominate over common questions of law and fact.**

"[I]t has been commonly recognized that the necessity for calculations of damages on an individual basis should not preclude class determination when common liability issues which determine liability predominate." *Chiang v. Veneman*, 85 F.3d 256, 273 (3rd Cir. 2004) (*quoting Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3rd Cir. 1977)).   As shown above, Plaintiff's breach of contract claim is susceptible of common classwide proof.    The law is clear that "any breach of contract entitles the injured party to at least nominal damages." *Scobell, Inc. v. Schade*, 688 A.2d 715, 719 (P.A. Super. 1997)(quoting *Aiken Industries, Inc. v. Estate of Wilson*, 383 A.2d 808, 811-812 (P.A. 1978)).   Thus, Plaintiff can demonstrate damages from JH's breach of contract on a class wide basis.

While not necessary for class certification, it is noteworthy that evidence adduced thus far shows that damages, in addition to nominal damages, are calculable on a classwide basis.   Plaintiff's actuarial expert testified that it is feasible to build a model

taking any differences into account to come up with an equitable distribution of damages. Ex. E, Cutlip dep. vol. II, p. 132.  Ian Roke an assistant vice president even suggested a method to calculate damages:

> "If we go back to the example I talked about before where we look at what the cash flow under the contract would be, we would have a different amount of interest credited in the first year for lack of a bonus.  And as such if we credited the same amount of interest as we did on this particular case, if you excluded that upfront the profitability on the product would have been higher.  So to target the overall profit number you would end up crediting a different amount in the later years.

> Q.     After year one on the non-bonus product you would credit more interest; right?

> A.     All else being equal."

Ex. A, Roke dep. at 76; see also Ex. F, Cutlip aff. ¶ 20.

### c.     A nationwide class does not defeat predominance or create manageability problems that would defeat class certification.

Plaintiff acknowledges that she bears the burden "of providing an 'extensive analysis' of the state law variations to determine whether there are 'insuperable obstacles' to class certification." *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 219 (E.D.P.A. 2000) (citation omitted).   However, "[t]he mere existence of state law variations is not alone sufficient to preclude class certification."   *Id.*, 194 F.R.D. at 221. "[A] district court should examine whether varying state laws can be grouped by shared elements and applied as a unit in such as way that the litigation class is manageable."   *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529(3rd Cir. 2004).   Even if the Court finds that "variations are marked," nationwide class actions have still been maintained. *Lyon*, 194 F.R.D. at 219.  "When state law variations are significant, however, courts have approved class certifications where 'the evidence in each case [on major factual questions] was

either identical or virtually so.'" *Id.* (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)) "[T]he fact that there may be variations in the rights and remedies available to injured class members under the various laws of the 50 states in this matter does not defeat commonality and predominance," *In re Warfarin Sodium*, 391 F.3d at 530.

> **d.    The Laws of the 50 States are in Accord on Plaintiff's and Class Members' Breach of Contract Claims.**

Every state agrees that to establish a breach of contract claim, the plaintiff must show a contract between the parties, a breach of an obligation under that contract and damages resulting from that breach. *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. 2006). *See also* Ex. O (citing cases from the 50 states and the District of Columbia showing the breach of contract standard).

Here, Plaintiff alleges and the evidence shows that Class members' deferred bonus annuities were materially identical contract forms with an application stating that the annuitant was guaranteed a bonus. *See* Facts §D above. Accordingly, the standardized form policy contracts, common misconduct by JH in breaching those contracts and the damage flowing therefrom are all demonstrable based on materially identical contract language, books and records of JH showing the target spread and base rate credited to Plaintiff and Class members. Simply put, the contracts are the same, the application of the bonus is the same in the contracts, the recoupment of the bonus is a systematic mathematical process that does not vary between contracts.

The "reasonable expectations" doctrine applies to Plaintiff's deferred bonus annuity contract. *Ross v. Metropolitan Life Insurance Company*, 411 F. Supp.2d 571, 581-82 (W.D.Pa.2006). Plaintiff alleges that the "interest rate/guarantee period" for the

first year bonus in the Individual Annuity Application and in the Annuity Policy Form created a "reasonable expectation" that her policy would have a one-year guaranteed interest rate of an additional one percent, such that JH's recouping that one year bonus breached her contract.  *Id.  See also* Ex. K, and Ex. J.  Forty states and the District of Columbia have adopted the "reasonable expectation" doctrine.  *See* Ex. P.  It is reasonable that a purchaser of a bonus annuity would expect (and in fact deserve) to permanently retain the bonus after year one.  It is reasonable not to expect the bonus will be stripped after year one.  Plaintiff has met her burden of demonstrating that her claims are based on substantially uniform principles of laws applicable in all fifty states and the District of Columbia and that no insurmountable obstacles exist.

> **e.     Class Treatment of These Claims is the Superior Method of Adjudication.**

Under Rule 23(b), the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."  *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 632 (3rd Cir. 1996)(citations omitted).  Rule 23(b)(3) identifies four factors relevant to a superiority inquiry:

> "(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;  (b)  the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;  (c)  the desirability or understanding of concentrating the litigation of the claims in the particular forum; and  (d) the difficulties likely to be encountered in the management of a class action."

Fed. R. Civ. P. 23(b)(3).  A class action is the superior method to adjudicate the claims when it will protect the rights of class members who may lack the financial resources to bring the alleged wrongdoers into court.  *Amchem Prods., Inc.*, 521 U.S. at 617.  "The

purpose of the superiority requirements is consistent with the overall goals of Rule 23, which is to assure that the class action is the most efficient, effective and economic means of settling the controversy." *Walco Inv., Inc. v. Thenen*, 168 F.R.D. 315, 337 (S.D. Fla. 1996) (quoting 7A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure: Civil* § 1779 (1986)). The court's focus "is not on the convenience or burden of a class action suit *per se*, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to plaintiffs." *Klay v. Humana,* 382 F.3d 1241, 1269(11th Cir. 2004). "The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims, but rather, to achieve the economies of time effort, and expense." *Sterling*, 855 F.2d at 1196-97. "While members of the class may be capable of litigating separate actions, Rule 23 has no restrictions on wealth." *In re Revco Sec. Litig.*, 142 F.R.D. 659, 669 (N.D. Ohio 1992).

Class actions are complex and time consuming by their very nature. However, this does not alleviate the need and desirability of class action adjudication. In this case, because common issues clearly predominate over any potential individual issues, it would be difficult for JH to argue that any alternative means of adjudicating these claims are available or desirable. Neither the parties nor the judicial system would benefit from duplicative litigation here. "What would be unmanageable is the institution of numerous individual lawsuits." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 189 (N.D. Ill. 1992).

Manageability encompasses "the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen*, 417 U.S.at 164.

Manageability issues pose a barrier to class certification only where they create a situation in which the class action is less fair and efficient than other available adjudication techniques." *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 358 (E.D.Pa. 1976). "[M]ost courts hold that manageability difficulties cannot support denial of class certification when no other practical litigation alternative exists." *In re Prudential*, 962 F. Supp at 525.   Denial of class certification on the grounds of "vaguely perceived manageability obstacles" is disfavored by courts because such an action would be "counter to the policy behind Rule 23, and because that court [would be] discounting unduly its power and creativity in dealing with a class action flexibly as difficulties arise." *NASDAQ*, 169 F.R.D. at 528.   Additionally, when "each class members' claims center on common questions and [when there is] overlap between the required questions of proof ... [the] ecomomies of scale are magnified when weighed against the burden [the various] court systems would endure in trying numerous duplicative suits." *Hanrahan*, 174 F.R.D. at 365-66.

This case presents a classic example of the superiority and efficiency of a class action weighing far greater than the maintenance of thousands of individual actions which would significantly monopolize the resources of the court.   Courts have repeatedly and consistently found that claims involving interpretations of form contracts and damages arising from defendants' uniform business practices present the "classic case" for treatment as a class action.[2]   Liability here focuses on the nationwide wrongdoing of

---

[2] *See Kleiner v. First National Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983): When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.   *E.g., Broad v. Rockwell Intern. Corp.*, 642 F.2d 929 (5th Cir.) (en banc) *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (breach of indenture agreement); *Irving Trust Co. v. Nationwide Leisure Corp.*, 95 F.R.D. 51 (S.D.N.Y.1982) (breach of contract for failure to provide charter tour services); *Jennings Oil Co., Inc. v. Mobil Oil Corp.*, 80 F.R.D. 124 (S.D.N.Y.1978) (validity of general release provision of contract); *Davis Cattle Co. v. Great*

JH in breaching standard, materially identical policy contracts, which resulted in annuitants being deprived of their guaranteed first year bonus interest rate.   This wrongdoing impacted the class members in a uniform manner.   Maintenance of a class action suit would provide class members with their "day in court" without overburdening the judicial system with a multiplicity of duplicative lawsuits.

Finally, Plaintiff's claims do not create significant concerns or manageability issues.   As discussed above, there will be no problematic individualized inquiry into a particular Plaintiff's damages because the damages can easily be calculated based on objective criteria.   Ex F, Cutlip aff. ¶ 20.   Similarly, there are no choice of law difficulties likely to be encountered in the management of this case that cannot be resolved or that clearly outweigh the benefit of maintaining this case as a class action.   The benefits of class action adjudication are as great for JH as for Plaintiff.   JH would be relieved of defending this action in multiple courts throughout the entire country and its culpability, or lack thereof, would be decided in one proceeding.   Additionally, a single forum is warranted and desirable because the core legal and factual issues which give rise to Plaintiff's claims can be easily managed and adjudicated on a class wide basis by reference to a core set of documents, fact witness testimony and expert testimony.   No other practical litigation alternative exists in light of the number of common claims in this action.   "[W]here a court has already made a finding that common issues predominate

*Western Sugar Co.*, 393 F.Supp. 1165 (D.Col.1975) (breach of contract); *Janicik v. Prudential Insurance Co. of America*, 305 Pa.Super.Ct. 120, 451 A.2d 451 (1982) (interpretation of form insurance contract); *Derenco, Inc. v. Benj. Franklin Fed. Sav. & Loan Assn.*, 281 Or. 533, 577 P.2d 477 (1978) (form mortgage); *Buchanan v. Brentwood Federal Savings and Loan Assn.*, 457 Pa. 135, 320 A.2d 117 (1974) (form contract); *Perlman v. First National Bank of Chicago*, 15 Ill.App.3d 784, 305 N.E.2d 236 (1st Dist.1973) (360-day year method of computing interest); *Georgia Investment Co. v. Norman*, 229 Ga. 160, 190 S.E.2d 48 (1972) (validity of loan note); *Silverstein v. Shadow Lawn Sav. & Loan Assn.*, 51 N.J. 30, 237 A.2d 474 (1968) (breach of contract based on method of calculating interest).

over individualized issues, we would be hard pressed to conclude that a class action is less manageable that individual actions. *Klay*, 382 F.3d at 1273. Here, a class action is unquestionably the superior method of adjudication in this action.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court grant her Motion for Class Certification.

By: */s Joseph H. "Jay" Aughtman*
Joseph H. "Jay" Aughtman (*pro hac vice*)
W. Daniel "Dee" Miles, III (*pro hac vice*)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama  36103-4160
(334) 269-2343

*of Counsel:*
John A. Corr, Esquire
Stephen A. Corr, Esquire
MELLON, WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA  18901
(215) 348-7700
Fax: (215) 348-0171

Attorneys for Plaintiff and the Putative Class

## CERTIFICATE OF SERVICE

I hereby certify that I have served upon all Defendants of record as listed below by electronic mail on this the 22nd day of April, 2008.

*/s Joseph H. "Jay" Aughtman*
OF COUNSEL

Shaunda Patterson-Strachan
Waldemar J. Pflepsen Jr.
**JORDEN BURT LLP**
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, DC  20007

Patricia M. Hamill
**CONRAD O'BRIEN GELLMAN
& ROHN, P.C.**
1515 Market Street Sixteenth Floor
Philadelpha, PA 19102