**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARIA SMITH, on behalf of herself** | : | |
| **and all others similarly situated,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **JOHN HANCOCK INSURANCE** | : | |
| **COMPANY,** | : | **No. 06-3876** |
| **Defendant.** | : | |

<u>**MEMORANDUM AND ORDER**</u>

**Schiller, J.**                                                                                     **September 2, 2008**

Plaintiff Maria Smith brings this action against Defendant John Hancock Insurance Company

asserting claims for fraud/intentional misrepresentation, negligent misrepresentation, negligence,

breach of fiduciary duty, civil conspiracy, breach of contract, unjust enrichment, disgorgement, and

violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

Plaintiff's claims arise from her purchase of one of Defendant's "bonus" annuities – Plaintiff asserts

that Defendant unlawfully recouped the "bonus" she was credited in the first year of her annuity

contract by lowering her interest rate in subsequent years.   Presently before this Court is Defendant's

motion for summary judgment.[1]   For the reasons discussed below, the motion is granted in part and

denied in part.

I.        **BACKGROUND**

Insurance companies make a profit from an annuity by investing premiums the purchaser of

---

[1] Plaintiff brings this case as a putative class action.  Defendant's motion for summary judgment pertains solely to Plaintiff in her individual capacity.  Plaintiff's outstanding motion for class certification will be addressed in a subsequent opinion.

that annuity invested in it.  (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s Resp."] Ex. G (Affidavit of William C. Cutlip [hereinafter "Cutlip Aff."]) ¶ 6.)  The company pays for its expenses, captures charges and makes its profit primarily from the investment spread, or the difference between the investment earnings on the premiums and the portion of those earnings credited to the contract holder.  (*Id.*)  Purchasers of bonus annuities, such as Plaintiff, are offered a higher interest rate in the first year, "usually 1.0% to 1.5% percentage points higher than what they refer to as the 'base rate.'" (*Id.* ¶ 7.)  Plaintiff claims that bonus annuities are "designed to give the appearance of being initially enhanced" in order to "encourage purchasers to invest with that insurance company."  (*Id.*)  Plaintiff asserts, however, that the higher first year bonus interest rate "creates more early profit loss and a greater demand on reducing future interest rates to recoup that loss" and achieve the target spread.  (*Id.* ¶ 10.)  The target spread is "set as a targeted revenue amount used to pay for various expenses, setting up reserves, setting up target surplus, and to achieve a desired level of profitability." (Pl.'s Resp. Ex. D (Deposition of John D. Fenton [hereinafter "Fenton Dep."]) at 45:6-9.)  A target spread is established by an insurance company when it first designs an annuity in order to ensure its profitability.  (Cutlip Aff. ¶ 8; Fenton Dep. at 52:23-35.)  Thus, Plaintiff claims that the bonus included in her annuity contract was "illusory and not a true representation of something 'extra.'"  (Cutlip Aff. ¶ 11.)

A.    **GPA Choice Fixed Deferred Annuity**

During the relevant time frame, Defendant sold a product known as the GPA Choice Fixed Deferred Annuity.  The GPA Choice Fixed Deferred Annuity credits interest to premiums contributed by the contract holder at rates declared in advance and guaranteed for a time period of one or more years (the "Guarantee Period"), as selected by the contract holder.  (Def.'s Mot. for

Summ. J. Related Solely to the Pl. in her Individual Capacity [hereinafter "Def.'s Mot."] Declaration of Kristin B. Temple [hereinafter "Temple Dec."] at ¶ 5.)  The declared rate for the contract's initial Guarantee Period is referred to as the "base rate."  (*Id.*)  During the first year of any Guarantee Period, initial or renewed, Defendant has the right to declare in advance an additional "bonus rate" of interest in addition to the declared rate of interest.  (*Id.* at ¶ 7.)

At the end of a Guarantee Period, the contract holder can renew an annuity contract for a new Guarantee Period at an interest rate declared by Defendant (the "renewal rate").  (*Id.* at ¶ 6.) Contract holders may select the length of the renewal Guarantee Period.  (*Id.* Ex. 1 at 5.)  However, if the previous Guarantee Period was one year, the renewal Guarantee Period must be one year as well.  (*Id.*)  Renewal interest rates are at least 3%.  (*Id.* ¶ 6.)  A contract holder can also chose for any reason not to renew and may withdraw the initial premium and accumulated interest.  (*Id.*)  However, withdrawals in excess of 10% of the contract value may be subject to charges of up to 7% of the amount being withdrawn if made in the first five to seven years of the contract.  (*Id.* Ex. 1 at 7-8.)

**B.     Plaintiff's Purchase of the Annuity Contract**

In May 2002, Plaintiff purchased a contract for Defendant's GPA Choice Fixed Deferred Annuity, Contract No. GP 06003233 ("Annuity Contract"), initially funding the annuity with $50,000.00.   (Compl. ¶¶ 5, 14.) Plaintiff purchased her Annuity Contract from a financial representative named Timothy Lago.  (Compl. ¶ 14.)  It is unclear if Mr. Lago was employed by Keystone Nazareth Bank ("Keystone Bank") in Pennsylvania, by a registered broker dealer called Invest Financial Corporation & Subsidiaries ("Invest"), or by both.  (Def.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J. [hereinafter "Undisputed Facts"] ¶ 3; Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s Resp."] Ex. O (Deposition of Timothy Lago [hereinafter

3

"Lago Dep."]) at 12:12-16; Def.'s Mot. Declaration of Shaunda Patterson-Strachan [hereinafter "Patterson Dec."] Ex. 1 (Deposition of Ruth A. Burgess [hereinafter "Burgess Dep."]) at 34:2-14; Def.'s Mot. Patterson Dec. Ex. 2 (Deposition of Patrick Clifford [hereinafter "Clifford Dep."]) at 13:6-14:2.) Nevertheless, at all relevant times, Defendant maintained a contractual relationship with Invest, authorizing Invest through its agents, including banks and their representatives, to solicit applications for certain fixed insurance and annuity products issued by Defendant. (Undisputed Facts ¶ 6.) Moreover, during that same time, Keystone Bank had a relationship with Invest acting as one of its agents. (*Id.* ¶ 7.) It is undisputed that Mr. Lago never worked directly for Defendant. (Clifford Dep. at 14:19-24.)

Prior to purchasing the Annuity Contract, Plaintiff maintained bank accounts at Keystone Bank. (Pl.'s Resp. Exs. P-1, P-2 (Deposition of Maria Smith [hereinafter "Smith Dep."]) at 42:3-5.) Moreover, Plaintiff stated that at the same time, she was familiar only with Defendant's name. (*Id.* at 93:2-8.) In purchasing the Annuity Contract, Plaintiff hoped to make a long-term investment for retirement purposes that would perform better than certificates of deposit ("CDs"). (*Id.* at 91:14-92:4.) Thus, what was most important to Plaintiff was the interest rate being offered. (*Id.* at 164:21-23; 165:7-10.) The Annuity Contract purchased by Plaintiff had a guarantee period of 1 year at a rate of 5.5% for the first year, which included a 4.5% base rate plus a 1% bonus. (Pl.'s Resp. at 2.)

In connection with her purchase of the Annuity Contract, Plaintiff executed a disclosure statement which explained that her Annuity Contract's "current annual yield on [her] initial premium payment is 5.5% (base rate plus bonus) for one year which includes in the first year a one-time 1.00% bonus for each premium payment." (Def.'s Mot. Patterson Dec. Ex. 10.) With regard to the renewal rate, the disclosure statement expressly stated that the yield for each renewal period would

4

be "based upon rates declared by John Hancock at the time" and would "never be less than 3%." (*Id.*)

The disclosure statement executed by Plaintiff did not include certain language required by the Pennsylvania Department of Insurance ("PDOI").  (Pl.'s Resp. Ex. C (Deposition of Kristin B. Temple [hereinafter "Temple Dep."]) at 22:3-11.)  As of June 4, 2001, the PDOI required Defendant to include the following bonus disclosure language in a disclosure statement:

> The expenses for a contract with a bonus benefit may be higher than expenses for a contract without a bonus benefit.  The amount of the bonus benefit may be more than offset by the fees and charges associated with the bonus benefit.

(Pl.'s Resp. Ex. M.)  Defendant ultimately adopted this language into its standard disclosure statement accompanying the sale of the GPA Choice Fixed Deferred Annuity in Pennsylvania. (Temple Dep. at 24:15-19; *see also* Pl.'s Resp. Exs. J, N.)  Without the inclusion of this language, the product would not have been approved by the PDOI for sale in Pennsylvania.  (Temple Dep. at 25:10-20.)  Nevertheless, Plaintiff's disclosure statement did not include the required bonus disclosure language (*Id.*. at 26:2-8), and Defendant made no attempt to rectify this deficiency (*Id.* at 26:9-27:15).

### C.    Jackson National Annuities

Plaintiff also applied for two Jackson National annuities in July of 2002.  (Smith Dep. at 194:20-22.)  At the time Plaintiff purchased the Jackson National annuities she had the same investment goals as when she purchased Defendant's annuity, namely long-term investment for retirement purposes.  (*Id.* at 199:3-9.)  Like the annuity Plaintiff purchased from Defendant, the Jackson National annuities were bonus annuities offering first year interest rate bonuses.  (*Id.* at 200:10-14.)  However, unlike Defendant's annuity, the Jackson National annuities contained

disclosure language stating that "as a result of the bonus interest rate, rates in subsequent years will be lower than that credited on non-bonus contracts." (*Id.* at 212:16-21.) Plaintiff stated that if she had seen that language when she purchased the Jackson National annuities, she would not have bought the contracts as she was looking for a fixed, not variable, interest rate. (*Id.* at 213:7-20.)

**D.     Plaintiff's Surrender of her Annuity Contract**

Plaintiff renewed her Annuity Contract with Defendant five times, each for an additional one-year Guarantee Period from 2003 until 2007, all at interest rates greater than 3%. (Temple Dec. ¶ 9.) She also received statements from Defendant on at least an annual basis setting forth the specific rates being credited to her annuity. (Smith Dep. at 180:5-15.) Plaintiff surrendered her Annuity Contract in 2007 for another annuity from a different insurer. (Temple Dec. ¶ 10.) Plaintiff was not charged any withdrawal charges, receiving her $50,000.00 initial premium and $11,279.23 in interest. (*Id.*) The interest credited to her was consistent with the rates per the Annuity Contract, specifically 5.5% in 2002, 4% in 2003, 3.25% in 2004, 3.25% in 2005, 3.35% in 2006 and 3.35% in 2007. (*Id.* ¶ 9-10.) No unauthorized charges, fees or deductions were made to Plaintiff's account. (*Id.* ¶ 10.)

**E.     Plaintiff's Allegations**

Plaintiff claims that in order to meet the target spread and achieve the desired level of profitability, Defendant offered Plaintiff lower renewal interest rates. (Cutlip ¶ 9.) Plaintiff argues that the renewal interest rates for a non-bonus annuity product would be higher than those for a bonus annuity because the spread required to meet the target spread would be lower. (Pl.'s Resp. Exs. A, A-1 (Deposition of Ian Roke [hereinafter "Roke Dep."]) at 80:1-18.) Plaintiff's expert witness found that if the bonus offered Plaintiff was a true bonus, then Plaintiff's base rate would

6

have been 20 basis points higher.  (Pl.'s Resp. Exs. E, F (Deposition of William C. Cutlip [hereinafter "Cutlip Dep."]) at 88:15-18.)  Plaintiff's expert also found that a "'bonus' annuity will usually produce lower returns to a purchaser than a regular non-bonus annuity after only a short period of time."  (Cutlip Aff. ¶ 18.)

Plaintiff also highlights that contract holders could not simply withdraw their money if they were unhappy with the renewal interest rate offered.  (*Id.* ¶ 14.)  Once purchasers were "brought in with a competitively attractive first year 'base rate plus bonus,'" they were then subject to early withdrawal charges.  (*Id.*)  As a result, "if the purchasers were dissatisfied with the renewal rates (reduced 'base rates') the company established (as a result of the company's charging their first year 'base rate'), it was going to cost the purchasers much (if not all) the earnings on their investments for at least 5 years if they tried to take their money out."  (*Id.*)  Hence, Plaintiff claims that purchasers of Defendant's bonus annuities had little choice but to accept the renewal interest rates, making market competition a moot point.  (*Id.*)

Plaintiff contends that when Defendant offered "what they call their 'bonus' first year interest on top of their 'base rate,' they are not providing any real 'bonus,' or extra credit, to the purchaser. They are simply shifting the timing of what they will credit, not necessarily to the benefit of the purchaser."  (*Id.* ¶ 9.)  Moreover, Plaintiff claims that Defendant guaranteed that the bonus credited in the first year of the Annuity Contract was for the permanent benefit of the annuitant.  (Roke Dep. at 77:14-78:4.)

Defendant offers expert testimony asserting that recoupment did not occur in any form. (Fenton Dep. at 77:17-21.)  Defendant's expert found that Plaintiff's renewal credited rate would only be 16 basis points higher if she had purchased a hypothetical non-bonus annuity product.  (*Id.*

at 102:4-10.)  As a result, Defendant's expert found that because Plaintiff surrendered her annuity after five years, she was better off purchasing the bonus annuity product than a hypothetical non-bonus annuity.  (*Id.* at 108:9-19.)  Defendant's expert rejected the idea that the target spread determined the renewal rates.  (*Id.* at 105:11-106:10.)  Instead, he stated that the impact of other factors made it impossible for one to say with any certainty whether renewal interest rates for a bonus annuity would be lower or higher than those for a non-bonus annuity.  (*Id.*)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  When the moving party does not bear the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for him at trial.  *Id.* at  248.  In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).  Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

8

## III.    DISCUSSION

After consideration of the parties' submissions, this Court concludes that summary judgement is appropriate on Plaintiff's claims for negligent misrepresentation (Count II), negligence (Count III), breach of fiduciary duty (Count IV), breach of contract (Count V), civil conspiracy (Count VI), unjust enrichment (Count VII) and disgorgement (Count IIX).  However, Plaintiff's claims for fraud/intentional misrepresentation (Count I) and violations of the UTPCPL (Count IX) are not barred by Pennsylvania law nor do they lack merit as a matter of law.  Thus, this Court will grant Defendant's motion for summary judgment in part and deny the motion in part.

### A.    Breach of Contract Claim

In order to sustain a claim for breach of contract, Plaintiff must establish "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). Plaintiff's contract claim fails because she does not identify "any contractual duty of immediate performance" that Defendant failed to perform. *Barnes v. McKellar*, 644 A.2d 770, 775 (Pa. Super. Ct. 1994) (*quoting Camenisch v. Allen*, 44 A.2d 309, 310 (Pa. Super. Ct. 1945)).  Contrary to Plaintiff's assertions, the Annuity Contract has no provision prohibiting Defendant from recouping the bonus interest paid in year one or guaranteeing Plaintiff the permanent benefit of said bonus interest.  As a result, this Court finds that Defendant did not breach any duty imposed by the contract and Plaintiff's claim for breach of contract must fail.

In an attempt to keep her claim alive, Plaintiff asserts that the "reasonable expectations" doctrine applies to Plaintiff's Annuity Contract.  (Pl.'s Resp. 29.)  Under Pennsylvania law, the "reasonable expectations" doctrine states that "the reasonable expectations of the insured is the focal

point of the *insurance* transaction." *UPMC Health System v. Metropolitan Life Ins. Co.*, 391 F.3d

497, 502 (3d Cir. 2004) (emphasis added) (*quoting Collister v. Nationwide Life Ins. Co.*, 388 A.2d

1346, 1353 (Pa. 1978)).  Plaintiff argues that because annuity contracts are regulated by the PDOI,

they are legally the same as life insurance products.  (Pl.'s Resp. at 18 n.7.)  However, it is well

established under Pennsylvania law that annuity contracts and insurance contracts are distinct

animals.  *In re Bayer's Estate*, 26 A.2d 202, 203-05 (Pa. 1942) (explaining the difference between

annuity contracts and insurance contracts at length); *Commonwealth v. Metropolitan Life Ins. Co.*,

98 A. 1072, 1073 (Pa. 1916) (same).   Thus, this Court declines to extend the "reasonable

expectations" doctrine to annuity contracts.

 Plaintiff also argues that Defendant breached the implied covenant of good faith and fair

dealing.  (Pl.'s Resp. 30.)  This doctrine implies "an agreement by the parties to a contract to do and

perform those things that according to reason and justice they should do in order to carry out the

purpose for which the contract was made and to refrain from doing anything that would destroy or

injure the other party's right to receive the fruits of the contract." *Somers v. Somers*, 613 A.2d 1211,

1214 (Pa. Super. Ct. 1992) (*citing Frickert v. Deiter Bros. Fuel Co., Inc.*, 347 A.2d 701, 705 (Pa.

1975) (Pomeroy, J., concurring)).  However, "this obligation of good faith is tied specifically to and

is not separate from the duties a contract imposes on the parties." *Murphy v. Duquesne U. of the

Holy Ghost*, 777 A.2d 418, 434 n.11 (Pa. 2001).  As discussed *supra*, Plaintiff cannot establish any

breach by Defendant.  Since Defendant performed all of the duties imposed on it by the Annuity

Contract, the purpose of the contract was carried out and Plaintiff received the benefits she

contracted to receive.  Therefore, Defendant did not breach the implied covenant of good faith and

fair dealing and Defendant is entitled to summary judgment on Plaintiff's claim for breach of

contract as a matter of law.

      **B.**     **Unjust Enrichment and Disgorgement Claims**

Under Pennsylvania law, it is well established that "the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006); *Third Nat'l Bank & Trust Co. of Scranton v. Lehigh Valley Coal Co.*, 44 A.2d 571, 574 (Pa. 1945). The doctrine of unjust enrichment "applies only to situations where there is no legal contract." *Wingert et al. v. T.W. Phillips Gas & Oil Co.*, 157 A.2d 92, 94 (Pa. 1959). Here, it is undisputed that the relationship between the parties is founded upon a written contract. (*See* Compl. at ¶ 72.) Thus, Plaintiff is not entitled to any remedy available under the doctrine of unjust enrichment and her claim on this basis fails as a matter of law.[2]

Although pled as a separate cause of action, disgorgement is actually "an equitable remedy designed to deprive a wrongdoer of his unjust enrichment." *S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *see also Pierson v. Source Perrier, S.A.*, 848 F.Supp. 1186 (E.D.Pa. 1994). As the purpose of this remedy is to "prevent unjust enrichment," if the doctrine of unjust enrichment is inapplicable, then disgorgement cannot be awarded. *Hateley v. S.E.C.*, 8 F.3d 653, 655 (9th Cir. 1993) (*citing S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991)). As the doctrine of unjust enrichment is inapplicable to this action, then Plaintiff's claim for disgorgement fails as well.

--------------------------------------------------

[2] Plaintiff argues that she should be allowed to plead in the alternative for unjust enrichment because there are disputed issues of fact with regard to the terms of the contract. (Pl.'s Resp. at 33.) As explained above, this Court found that the Annuity Contract had no provision either guaranteeing Plaintiff the permanent benefit of the bonus interest paid in year one or prohibiting Defendant from recouping the same. (*See supra* Part III.A.) Therefore, there is no genuine issue of fact regarding the interpretation of the Annuity Contract.

Hence, Defendant is entitled to judgment as a matter of law on Plaintiff's claims for Unjust Enrichment (Count VII) and Disgorgement (Count IIX).

### C.      Breach of Fiduciary Duty Claim

Pennsylvania law finds a fiduciary relationship "where by virtue of the respective strength and weakness of the parties, one has a power to take advantage of or exercise undue influence over the other." *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22 (Pa. Super. Ct. 2002). However, the relationship must go "beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on the one side or 'weakness, dependence, or trust justifiably reposed' on the other side." *Id.* at 23 (*quoting Basile v. H & R Block*, 777 A.2d 95, 101 (Pa. Super. Ct. 2001). A fiduciary duty may exist when "one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Brooks v. Conston*, 51 A.2d 684, 688 (Pa. 1947). A fiduciary relationship will also be formed by "those who purport to give advice in business . . . if others, by virtue of their own weakness or inability, the advisor's pretense or expertise, or a combination of both, invest such a level of trust that they seek no other counsel." *Basile*, 777 A.2d at 102.

Here, Plaintiff's claim for breach of fiduciary duty first requires that a fiduciary relationship exist between her and Defendant. It is undisputed that Plaintiff had no contact with Defendant before purchasing her Annuity Contract. (*See* Smith Dep. at 92:5-93:8.) Rather, it was Mr. Lago who counseled her and ultimately sold her the Annuity Contract. Yet a fiduciary relationship did not exist even between Mr. Lago and Plaintiff. Mr. Lago expressly tailored his offerings to Plaintiff's aversion to risk and her desire to protect her principal. (Lago Dep. at 16:22-25.) Plaintiff admitted that the decision to buy Defendant's annuity products was hers. (Smith Dep. 198:9-11.) Finally,

Plaintiff also admitted to seeking other counsel, including that of her pastor, with regard to her investment decisions.  (*Id.* at 195:11-197:11.)

Moreover, at the time, Mr. Lago was working either for Invest or for Keystone Bank, Invest's agent.  As Invest was Defendant's agent, Mr. Lago was Defendant's sub-agent, "a person to whom the agent delegates as his agent, the performance of an act for the principal which the agent has been empowered to perform through his own representative."  *Klein v. May Stern & Co.*, 19 A.2d 566, 568 (Pa. Super. Ct. 1941) (citation omitted).  "Liability for the acts of a sub-agent is imposed on the principal only by his express or implied agreement."  *Id.*  Moreover, there is no privity of contract between the sub-agent and the principal.  *Id.*  Plaintiff adduces no evidence that Defendant agreed to be liable for the actions of the agents of Invest.  Therefore, even if Mr. Lago established a fiduciary relationship with Plaintiff, Defendant would not be liable for any breach thereof.  As there is no genuine issue of material fact, Defendant is entitled to judgment as a matter of law on Plaintiff's claim for breach of fiduciary duty (Count IV).

### D.    Negligence Claim

Plaintiff's claim for negligence alleges that Defendant "negligently hired, trained, and/or supervised its agents and representatives who sold the bonus annuity."  (Compl. ¶ 50.)  Although Defendant can be liable for the conduct of its agents or employees, as well as any negligence attendant on their training, supervision, or the decision to hire or retain them, *see Heller v. Patil Homes, Inc.*, 713 A.2d 105, 107 (Pa. Super. Ct. 1998), it cannot be liable for the actions, training, supervision or hiring of its sub-agents, *Klein*, 19 A.2d at 568.  Thus, Defendant is entitled to summary judgment on Plaintiff's claim for negligence (Count III).

13

### E.     Civil Conspiracy Claim

A cause of action for civil conspiracy requires "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003). A combination requires that "two or more persons combine or enter an agreement" to commit the unlawful act. *Burnside v. Abbott Labs.*, 505 A.2d 973, 980 (Pa. Super. Ct. 1985). A "single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." *Rutherford v. Presbyterian-University Hosp.*, 612A.2d 500, 508 (Pa. Super. Ct. 1992).

Here, Plaintiff alleges that Defendant conspired with unnamed "banks" to commit fraudulent misrepresentations and other unlawful acts. (Compl. ¶¶ 65-66.) However, Plaintiff has failed to specify any individual or entity with whom Defendant conspired. Furthermore, Plaintiff has failed to produce any evidence of an agreement or combination between Defendant and another individual to commit an unlawful act. In fact, Plaintiff does not even attempt to defend this claim in her response. As Plaintiff has failed to create a genuine issue of fact, this Court grants Defendant summary judgment on Plaintiff's claim for civil conspiracy (Count VI).

### F.     Negligent Misrepresentation

Plaintiff's claim for negligent misrepresentation is barred by the economic loss doctrine. It is well established that if the economic loss doctrine is applicable, it bars actions for negligent misrepresentation. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 620-21 (3d Cir. 1995); *see also Werwinski v. Ford Motor* Co., 286 F.3d 661, 679 (3d Cir. 2002). Under

14

Pennsylvania law, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne*, 66 F.3d at 618. "The general rule is that economic losses may not be recovered in tort (negligence) absent physical injury or property damage." *Spivack v. Berks Ridge Corp., Inc.*, 586 A.2d 402, 405 (Pa. Super. Ct. 1990). The purpose of this doctrine is to maintain the separation between the law of contract and the law of tort. *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super. Ct. 1989). Plaintiff does not dispute that she is seeking exclusively economic damages in this lawsuit. Nor does she argue that her claims of suffering mental anguish and emotional distress remove her claims from the scope of the economic loss doctrine. Accordingly, since Plaintiff does not allege physical injury or property damage, her negligent misrepresentation claim is barred and summary judgement is granted as to that count.

Plaintiff argues that the claim should be allowed under *Bilt-Rite Contractors, Inc. v. The Architectural Studio*. 866 A.2d 270, 288 (Pa. 2005). However, the Third Circuit recently interpreted *Bilt-Rite* as carving out only a narrow exception to the economic loss doctrine, solely allowing "recourse from an 'expert supplier of information' with whom the plaintiff has no contractual relationship." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, — F.3d —, 2008 WL 2745939 at *14 (3d Cir. 2008) (*quoting Bilt-Rite*, 866 A.2d at 286). This is clearly not the case here. Not only is Defendant not an expert supplier of information but there was a contractual relationship between Plaintiff and Defendant. Hence, the economic loss doctrine bars Plaintiff's claim for negligence misrepresentation (Count II) and Defendant is entitled to summary judgment on the same.

### G.    Fraud/Intentional Misrepresentation

To establish her claim for intentional misrepresentation/fraud, Plaintiff must establish "(1)

a false representation of an existing fact or a nonprivileged failure to disclose; (2) materiality, unless the misrepresentation is intentional or involves a nonprivileged failure to disclose; (3) scienter, which may be actual knowledge or reckless indifference to the truth; (4) justifiable reliance on the misrepresentation, so that the exercise of common prudence or diligence could not have ascertained the truth; and (5) damage to him as a proximate result." *Wittekamp v. Gulf & Western, Inc.*, 991 F.2d 1137, 1142 (3d Cir. 1993).   Defendant claims that Plaintiff can show neither a material misrepresentation or omission, nor justifiable reliance.[3]

A misrepresentation is "any artifice by which a person is deceived to his disadvantage and may be by false or misleading allegations or by concealment of what should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment." *Wilson v. Donegal Mut. Ins. Co.*, 598 A.2d 1310, 1315 (Pa. Super. Ct. 1991).   An omission can constitute a misrepresentation as a "misrepresentation need not be in the form of a positive assertion" in order to be actionable. *Smith v. Renaut*, 564 A.2d 188, 191 (Pa. Super. Ct. 1988).   However, "an omission is actionable as fraud only where there is an independent duty to disclose the omitted information." *In re Estate of Evasew*, 584 A.2d 910, 913 (Pa. 1990) (citation omitted).   Thus, to state a claim for fraud, an assertion of an omission must be accompanied by a duty to speak. *Wilson*, 598 A.2d at 1316.

Here, Plaintiff argues Defendant made one positive misrepresentation and one omission.

---

[3] Defendant contends that Plaintiff's claim must fail because she cannot demonstrate the materiality of the misrepresentations and omissions alleged.  However, "materiality becomes important only when the misrepresentation was innocently made or when it involved a privileged failure to disclose." *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 614 (3d Cir. 1991).  Here, Plaintiff argues that the misrepresentations were intentional and Defendant's failure to disclose was not privileged.  Therefore, she need not establish materiality and the same will not bar her claim.

Plaintiff claims that there was no real bonus in her bonus annuity.  Thus, in calling it a bonus annuity, Defendant made a false representation.  The testimony of Plaintiff's actuarial expert, in addition to that from Ian Roke, Defendant's Assistant Vice President for Fixed Products, is sufficient evidence to create a genuine issue of material fact as to whether any bonus was actually conferred by Plaintiff's Annuity Contract.  If it did not, then calling the Annuity Contract a bonus annuity would be a misrepresentation.  Thus, summary judgment will not be granted on this claim.

Plaintiff also points to the disclosures required by the PDOI, which all parties agree were not included in Plaintiff's disclosure statements. (Temple Dep. at 26:2-8.)  Before this omission may be considered a misrepresentation actionable as fraud, however, this Court must first find a duty to speak.  Here, Defendant had a duty to speak because the PDOI required certain disclosures as a condition of selling its products in Pennsylvania.  (*Id.* at 25:10-20.)  As Defendant was selling its products in Pennsylvania, it had a duty to make the omitted disclosures.  Hence, Plaintiff has sufficiently established misrepresentations actionable under fraud to withstand summary judgment.

Plaintiff explained that the most important factor in her decision to purchase the Annuity Contract was the interest rate.  (Smith Dep. at 164:21-23; 165:7-10.)  Hence, a reasonable juror could decide that Plaintiff relied on Defendant's misrepresentation that there was bonus interest to be had or that she would not have purchased Defendant's products but for Defendant's omission in disclosing that the bonus may be ultimately offset.  It is true that Plaintiff bought the Jackson National annuities even though they contained disclosure language alerting her to the fact that the bonus annuities may not be the best deal.  (*Id.* at 212:16-21.)  However, it is still a genuine issue of

17

material fact whether Plaintiff relied upon Defendant's misrepresentations or omissions.[4]
Furthermore, any reliance by Plaintiff would be justified as Plaintiff could not have ascertained that
Defendant would recoup this bonus.  (*See infra* Part III.I.1.)

Defendant argues that this claim is barred by the economic loss doctrine as well.  While the
Third Circuit declined to carve out a broad exception to the economic loss doctrine, encompassing
all intentional fraud, it did acknowledge an emerging trend recognizing "a limited exception to the
economic loss doctrine for fraud claims, but only where the claims at issue arise independent[ly] of
the underlying contract." *Werwinski*, 286 F.3d at 676, 681; *cf. O'Keefe v. Mercedez-Benz USA, LLC*,
214 F.R.D. 266, 278 (E.D. Pa. 2003) ("Pennsylvania's economic loss doctrine is inapplicable to
intentional torts.").  In other words, when the fraud is "'extraneous to the contract'" and not
"'interwoven with the breach of the contract,'" the court opined that an exception to the economic
loss doctrine may exist.  *Id.* (*quoting Huron & Tool Eng'g Co. v. Precision Consulting Servs., Inc.*,
532 N.W.2d 541, 545 (Mich. Ct. App. 1995).  Here, the fraud alleged in Count I is a classic fraud-in-
the inducement claim where the fraud is not only extraneous to the contract but also unrelated to any
breach of contract.   Thus, the economic loss doctrine does not bar Plaintiff's claim for

---

[4] Defendant also argues that Plaintiff cannot show justifiable reliance because the Annuity
Contract is fully integrated, requiring the exclusion of all parol evidence, including any
representations made to Plaintiff prior to her purchase.  Defendant claims that any oral
misrepresentations or omissions were contradicted by the written materials Plaintiff failed to
review.  Defendant's arguments misconstrue Plaintiff's claims.  For fully integrated contracts, the
parol evidence rule excludes "evidence of any previous oral or written negotiations or agreements
involving the same subject matter as the contract . . . to explain or vary the terms of the contract."
*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436-37 (Pa. 2004).  However, Plaintiff is
not offering evidence of any prior negotiations or agreement.  Instead, she is arguing that if
Defendant calls something "bonus," then it should confer something extra to the consumer.
Neither the contract nor any of the written materials given to Plaintiff in conjunction with her
purchase of the Annuity Contract addressed this issue.  Moreover, the basis for Plaintiff's claims
is not within the scope of the Annuity Contract.  Thus, the parol evidence rule is inapposite.

fraud/intentional misrepresentation (Count I), and Defendant is not entitled to summary judgment on this count.

### H.    UTPCPL Claim

Defendant claims that the Annuity Contract performed exactly as it should have and that therefore Plaintiff's claim under the UTPCPL must be dismissed.  However, as discussed *supra*, Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether calling the Annuity Contract a "bonus annuity" was simply a marketing ploy meant to hook potential purchasers.  (*See supra* Part III.G.)  Such conduct would certainly be actionable under the UTPCPL as "advertising goods or services with intent not to sell them as advertised" or as "fraudulent and deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Stat. §§ 201-2(4)(ix), (xxi) (1996).

A claim under the UTPCPL requires proof of reliance, even if brought under the post-1996 catch-all provision.  *Hunt v. United States Tobacco Co.*, — F.3d —, 2008 W 2967249 at *2 (3d Cir. April 17, 2008).  However, as also explained *supra*, Plaintiff has produced sufficient evidence of justifiable reliance to defeat summary judgment on such grounds.  (*See supra* Part III.G.)

Moreover, this claim is not barred by the economic loss doctrine.  The Third Circuit has held that "the same policy justifications for applying the economic loss doctrine to common law intentional fraud claims supports the doctrine's application to [] UTPCPL claims."  *Werwinski*, 286 F.3d at 681.  Therefore, for the same reasons the economic loss doctrine does not bar Plaintiff's fraud/intentional misrepresentation claim (*see supra* Part III.G), the doctrine does not bar Plaintiff's UTPCPL claim either.  Hence, Defendant is not entitled to summary judgment on Plaintiff's UTPCPL claim (Count IX).

I.      **Defendant's Remaining Affirmative Defenses Fail**

       *1.      Statute of Limitations*

Defendant argues that Plaintiff's tort claims are barred by Pennsylvania's two-year statute of limitations pursuant to 42 Pa. Const. Stat. Ann. § 5524(7).  (Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. [hereinafter "Def.'s Mem."] at 30.)  However, under Pennsylvania law, the statute of limitations will be tolled by the discovery rule "when the underlying cause of action sounds in fraud, and [] the statute of limitations is tolled until the plaintiff learns or reasonably should have learned through the exercise of due diligence of the existence of the claim." *Beauty Time, Inc. v. VU Skin Systems, Inc.*, 118 F.3d 140, 148 (3d Cir. 1997).  The discovery rule is based on "the inability of the injured, despite the exercise of reasonable diligence to know that he is injured and by what cause." *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) (*quoting Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)).  Reasonable diligence "is what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised." *Fine*, 870 A.2d at 858.  In other word, there must be "some reason to awaken inquiry." *Id.* (*quoting Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000)).

Here, viewing the record in the light most favorable to Plaintiff, there was no reason for Plaintiff to believe at the time she purchased the annuity that Defendant would ultimately recoup her first year bonus.  Neither the contract nor any of the disclosures attached at the time of her purchase served to put Plaintiff on notice, and Defendant does not claim that any subsequent events should have alerted her to the fact that she had been injured.  After reviewing the actuarial testimony, this Court is inclined to agree that only a professional actuary could have discovered Defendant's alleged fraud.  Thus, this Court finds that Plaintiff was given no reason to exercise reasonable diligence.

Plaintiff had no way of ascertaining either that she was injured or the cause thereof.  Therefore, Plaintiff's claims are not precluded by the statute of limitations.[5]

       2.       *Gist of the Action Doctrine*

Defendant argues that the gist of the action doctrine bars Plaintiff's tort claims.  In Pennsylvania, the gist of the action doctrine requires that the gist of an action in tort be "the [tortious] wrong ascribed to the defendant . . . with the contract being collateral." *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103 (3d Cir. 2001).  The doctrine bars tort claims "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."  *Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super. Ct. 2005).

Plaintiff's tort claims arise out of Defendant's allegedly fraudulent and deceptive practices in marketing an illusionary bonus and in not making the required disclosures.  Thus, her claims do not arise solely from a contract, the duties involved cannot be found in the contract between the parties, liability does not stem from a contract, and their success is not dependent on the terms of the parties' contract.  Moreover, Plaintiff's tort claims do not duplicate a breach of contract claim – indeed, Plaintiff's claims sound in tort and not in contract.  (*See supra* Part III.A.)  As a result, the gist of the action doctrine does not bar any of Plaintiff's remaining tort claims.

       3.       *Damages*

Defendant argues that Plaintiff has not produced evidence of actual damages for each of her

---

[5] As this Court finds the statute of limitations is tolled by the discovery rule, it need not decide whether the fraudulent concealment doctrine applies.

claims.  (Def.'s Mem. at 31.)  Defendant contends that since Plaintiff received what she was contractually promised, she did not suffer any legally cognizable damages and this court must dismiss all of her claims.  (Def.'s Mem. at 32.)  However, Plaintiff asserts that she was entitled to permanently retain the bonus interest initially credited to her.  In support of her claim for damages, Plaintiff has produced testimony that if her Annuity Contract did not offer a bonus interest rate in its first year, then she would have received more interest in the subsequent years of her Annuity Contract.  (Roke Dep. at 73:5-19.)  Furthermore, Plaintiff's actuarial expert testified that the base rate paid to Plaintiff should have been 20 basis points higher each year in order for her to have truly received a bonus.  (Cutlip Dep. at 109:6-12.)  Thus, this Court finds that not only has Plaintiff sufficiently alleged damages, she has also produced enough evidence to create a genuine issue of material fact as to what damages she sustained.  Hence, this Court will not dismiss Plaintiff's remaining claims on this ground.

As for the punitive damages sought by Plaintiff, when there is sufficient evidence to establish actual fraud, "the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the factfinder." *Noyes v. Cooper*, 579 A.2d 407, 413 (Pa. Super. Ct. 1990) (*citing Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1263 (Pa. Super. Ct. 1983)). Moreover, a fact pattern supporting "a finding of intentional fraud without providing proof of 'outrageous conduct' to support an award of punitive damages" is hard to envision. *Id.*  Therefore, if Plaintiff produces sufficient evidence to support a finding of intentional fraud, then an award of punitive damages is an issue for the factfinder.  Hence, this Court will decline at this time to limit Plaintiff's ability to recover such damages.

**IV.     CONCLUSION**

      For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARIA SMITH, on behalf of herself** | : | |
| **and all others similarly situated,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN HANCOCK INSURANCE** | : | |
| **COMPANY,** | : | **No. 06-3876** |
| **Defendant.** | : | |

## ORDER

    **AND NOW**, this **2nd** day of **September**, **2008**, upon consideration of Defendant's motion for summary judgment (Document No. 70), Plaintiff's response thereto and Defendant's reply thereon, and for the foregoing reasons it is hereby **ORDERED** that Defendant's motion is **GRANTED in part** and **DENIED in part** as follows:

1.     Defendant's motion as to Plaintiff's claims for negligent misrepresentation (Count II), negligence (Count III), breach of fiduciary duty (Count IV), breach of contract (Count V), civil conspiracy (Count VI), unjust enrichment (Count VII) and disgorgement (Count IIX) is **GRANTED** and said claims are **DISMISSED**; and

2.     Defendant's motion as to Plaintiff's claims for fraud/intentional misrepresentation (Count I) and violations of the UTPCPL (Count IX) is **DENIED**.

                         **BY THE COURT:**

                         _____

                         **Berle M. Schiller, J.**